**TIFFANY & CO., Plaintiff,**

v.

**The BOSTON CLUB, INC., d/b/a Tiffany's,**

**and**

**46 Beacon Street, Inc., d/b/a Tiffany's, Defendants.**

**Civ. A. No. 62–117–C.**

United States District Court
D. Massachusetts.

July 2, 1964.

Lane McGovern, Boston, Mass., for plaintiff.

Arthur H. Bloomberg, Boston, Mass., for defendant.

CAFFREY, District Judge.

This is a civil action brought by Tiffany & Co., a corporation organized under the laws of the State of New York, with a principal place of business in New York City, against the Boston Club, Inc., d/b/a Tiffany's, a corporation organized under the laws of Massachusetts with a principal place of business in Boston, and against 46 Beacon Street, Inc., d/b/a Tiffany's, a corporation organized under the laws of Massachusetts with a principal place of business in Boston.

The amended complaint is in two counts, one of which seeks relief against the Boston Club, Inc. and the other against 46 Beacon Street, Inc. In each count plaintiff makes three distinct claims for relief (1) that defendant's use of "Tiffany's" in the name of the Restaurant and Lounge at 46 Beacon Street, Boston, infringes the plaintiff's federally registered trademarks within the meaning of Sec. 32 of the Trade-Mark Act of 1946, 60 Stat. 437, as amended, 1962, 76 Stat. 773, 15 U.S.C.A. § 1114; (2) that the defendant's use of "Tiffany's" also infringes upon the right which plaintiff has acquired at common law in conjunction with Mass.Gen.Laws, ch. 110, sec. 7A, to protect its common law trademarks and trade names "Tiffany" and "Tiffany & Co."; and (3) that the defendant's use of "Tiffany's" on the facts proven at the trial constitute a use which is properly enjoinable under the so-called anti-dilution provision of Mass.Gen. Laws, ch. 110, sec. 7A. Plaintiff asserts that this Court has jurisdiction as to the Lanham Act claim on the basis of 28 U.S.C.A. § 1338(a) and that it has jurisdiction of the other two causes of action both on the basis of pendent jurisdiction as set out in 28 U.S.C.A. § 1338 (b) and on the basis of diversity of citizenship and the jurisdictional amount being involved herein.

At the conclusion of the evidence defendant filed a motion to dismiss, challenging the Court's jurisdiction on the grounds (1) that less than $10,000 was involved herein, and (2) that defendant was not engaged in interstate commerce in the use of the name "Tiffany's Restaurant and Lounge." The motion also asserted that plaintiff had failed to prove a claim upon which relief could be granted.

It appears that plaintiff is now and for many years has been engaged in the business of selling at retail and at wholesale a substantial variety of merchandise, including silverware, jewelry, cutlery, china and glassware. Plaintiff was incorporated in 1868 and succeeded to a business previously carried on in New York City since the year 1837 by copartnerships successively known as Tiffany & Young; Tiffany, Young & Ellis; and Tiffany & Co. Plaintiff also acquired upon incorporation the good will, trademarks and trade names of its predecessors. Plaintiff and its predecessors have operated a retail store in New York City continuously since 1837. Plaintiff now owns and operates a nationally known retail store at the corner of Fifth Avenue and 57th Street in New York City. Plaintiff owns the trademarks and trade names "Tiffany" and "Tiffany & Co." and has used these trademarks and trade names continuously since its incorporation in 1868 in interstate, intrastate and foreign commerce, on articles it sells which include silverware, jewelry, china, glassware, leather goods, clocks, watches, brushes and lamps. Plaintiff has registered its trademarks "Tiffany" and "Tiffany & Co." in accordance with applicable

federal trademark registration statutes, including the Act of March 3, 1881, 21 Stat. 502, the Act of February 20, 1905, 33 Stat. 724, and the Lanham Act, 60 Stat. 427 et seq. (1946). Plaintiff has also registered its trademark and trade names in foreign countries and in many States of the United States, including Massachusetts, where plaintiff is the owner of Registration Nos. 9156 and 9157 issued on March 18, 1920.

Plaintiff sells at wholesale to various jewelry stores in Massachusetts articles manufactured by plaintiff which bear the trademarks "Tiffany" and "Tiffany & Co." These articles are then resold at retail to Massachusetts customers by those jewelry stores. Tiffany & Co. also does a mail order business from its New York headquarters to various customers within the Commonwealth of Massachusetts. Since 1956 plaintiff has conducted a series of public exhibitions presenting table settings reflecting good taste and imagination designed by persons prominent in the field of interior decorating. In 1960 plaintiff caused the publication of a book called "Tiffany Table Settings" and in 1961 published a book entitled "Tiffany's Table Manners for Teen Agers." Both of these books have been sold at retail in bookstores located in Massachusetts and other states, and I find that the public generally, in Massachusetts and elsewhere, associates the plaintiff and its china, silverware and stemware with dining of excellence and quality.

For many years plaintiff has expended very substantial amounts of money to promote its trademark and trade names and products and to maintain existing good will attributable thereto all over the United States as well as in Massachusetts. It has done so through the medium of advertisements in magazines of national circulation, in newspapers of multi-state circulation, and by direct mail advertising. As a result of these expenditures to keep its name and reputation favorably before the public, and as a result of its long business experience and the general excellence of the products it merchandises, its trade names "Tiffany" and "Tiffany & Co." have acquired a secondary meaning and have become widely and favorably known to the general public as identifying the plaintiff and the merchandise sold and distributed by it as being of high quality. Plaintiff has acquired and possesses highly valuable good will for its trade names and its products.

To particularize on the foregoing, I find that in the forty-year period ending in 1931 plaintiff's total sales exceeded $350,000,000; that during the last fifty years plaintiff's retail sales alone amounted to $429,214,669; and that for the years 1950 to 1963 plaintiff's sales (including both retail and wholesale) were as follows:

| | | | |
|---|---|---|---|
| 1950 | $6,664,712.62 | 1957–8 | $ 9,767,139.59 |
| 1951 | 6,940,347.12 | 1958–9 | 10,379,823.42 |
| 1952 | 6,595,687.71 | 1959–60 | 11,461,801.53 |
| 1953 | 6,708,441.80 | 1960–61 | 11,415,677.72 |
| 1954 | 7,123,132.47 | 1961–62 | 13,434,368.70 |
| *1955–56 | 9,032,361.35 | 1962–63 | 12,800,433.56 |
| 1956–57 | 9,397,075.87 | 1963–64 | 13,171,675.64 |

* Fiscal year changed from calendar year to 12 months ending January 31.

———◆———

The advertising referred to above consists of advertising in Vogue magazine from 1907 to 1947 and from 1956 to date; in Harper's Bazaar from 1917 to 1947 and from 1956 to date; and in the New Yorker from 1932 to date. The advertising in newspapers with multi-state circulation referred to above includes advertising in the New York Times from 1912 to date, in the New York Herald Tribune from 1912 to date, in the Wall Street Journal from 1925 to date, and

in 'the Christian Science Monitor from 1959 to date. In the 28-year period since 1935 plaintiff has spent $5,146,752 in advertising its business and products.

Plaintiff sells at wholesale products bearing the trademarks "Tiffany" and "Tiffany & Co." to the following Massachusetts retailers who in turn sell plaintiff's products at retail, Bigelow-Kennard Co., Boston; Thomas Long Co., Boston; Romm & Co., Brockton; Hall Galleries, Springfield; and F. A. Knowlton, Inc., Worcester. Plaintiff's sales to Bigelow-Kennard Co. for the years 1952 through 1963 totaled $157,878. Plaintiff's sales to Thomas Long Co. for the years 1960 through 1963 totaled $34,881. Plaintiff's sales to Romm & Co. for the years 1960 through 1963 totaled $8,522. Plaintiff's sales to the Hall Galleries for the years 1957 through 1963 totaled $12,103. Plaintiff's sales for the years 1960 through 1963 to F. A. Knowlton, Inc. totaled $2,848. In addition, Tiffany sells at wholesale in Alabama, Arkansas, California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, New Jersey, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Virginia, Washington, Wisconsin, and Canada.

Plaintiff also has what was described by its comptroller at the trial as a considerable charge account relationship with residents of Europe and all over the world. It has about 132,000 charge account customers, over 3,000 of whom live in Massachusetts as of April 1, 1964. Plaintiff has had about the same number of Massachusetts charge account customers for the past three years.

In addition to the retail business it conducts in New York and the wholesale and mail order business described above, Tiffany opened a branch store in San Francisco, California, in September 1963; a branch store in Houston, Texas, in October 1963; and a branch store is scheduled to open in Beverly Hills, California, in September of this year. At the time of trial, representatives of Tiffany were negotiating for the opening of a Tiffany branch in Boston which has' been under consideration for a period of four or five years.

The defendant's activities other than advertising would appear to be largely if not completely intrastate. Defendant has placed advertisements on radio stations WHDH, WBOS, WORL, WCRB, and on television station WBZ. Programs from all of these stations are transmitted in interstate commerce and are received by residents of States located to the North and South of Massachusetts.

 Defendant urges that because plaintiff in open court waived claim for money damages the requisite $10,000 jurisdictional amount is not involved herein and consequently no federal jurisdiction obtains. It is well-established that in cases of the instant type the jurisdictional amount is to be calculated on the basis of the property right which is being injured. If that property right has a value in excess of $10,000 a federal district court has jurisdiction of such a diversity suit even though plaintiff has not suffered $10,000 damages at the time the suit was instituted or tried. John B. Kelly, Inc. v. Lehigh Nav. Coal Co., 151 F.2d 743 (3 Cir. 1945), cert. denied 327 U.S. 779, 66 S.Ct. 530, 90 L.Ed. 1007; Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3 Cir. 1958); Food Fair Stores v. Food Fair, 177 F.2d 177 (1 Cir. 1949); Bitterman v. Louisville & Nashville R.R. Co., 207 U.S. 205, at p. 225, 28 S.Ct. 91, at p. 98, 52 L.Ed. 171 (1907), where the Supreme Court pointed out:

> "[T]he substantial character of the jurisdictional averment in the bill is to be tested, not merely by the mere immediate pecuniary damage resulting from the acts complained of, but by the value of the business to be protected and the rights of property which the complainant sought to have recognized and enforced."

It is clear that the rights sought to be protected herein by plaintiff are rights

of property. General Electric Co. v. Kimball Jewelers, Inc., 333 Mass. 665, 677, 132 N.E.2d 652 (1956).

Defendant urges that plaintiff has failed to establish jurisdiction under the Lanham Act for the reason that the record herein indicates that the economic activity of the defendant consists for the most part of intrastate activity. This contention must fail for two reasons. First, it is well-established that jurisdiction exists to grant relief under the Lanham Act if a defendant's activities although wholly intrastate tend to have a damaging effect on plaintiff's federally protected interstate business. Pure Foods v. Minute Maid Corp., 214 F.2d 792 (5 Cir. 1954). As Judge Wyzanski pointed out in Cole of California v. Collété, Inc., 79 U.S.P.Q. 267, 268 (D.Mass. 1948), "It is immaterial that defendant is engaged only in local sales in view of the fact that those local sales adversely affect plaintiff's interstate sales." See, also, Time, Inc. v. Life Television Corp., 123 F.Supp. 470 (D.Minn.1954) and Coca-Cola Company v. Foods, Inc., 220 F.Supp. 101 (D.S.D.1963). On the facts proven at the trial, which are discussed with more particularity *infra*, it is clear that defendant's activities even assuming them to be wholly intrastate clearly have a tendency to substantially and harmfully affect plaintiff's interstate business.

The second reason why defendant's contention re lack of Lanham Act jurisdiction must fail is that defendant's business is sufficiently interstate to supply a basis for federal jurisdiction if the above-cited grounds were not available, by reason of the fact that defendant has advertised on several radio stations and one television station which engage in multi-state transmissions, has placed advertisements in newspapers circulated in Massachusetts and several other states, and has utilized billboards located on interstate highways. International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678 (1910); Furst v. Brewster, 282 U.S. 493, 51 S.Ct. 295, 75 L.Ed. 478 (1931).

Turning to the merits of the case, the facts alleged and proved bring plaintiff squarely within the protection of the anti-dilution provisions of Mass.Gen. Laws, ch. 110, sec. 7A. It appears that defendant arbitrarily selected the name "Tiffany's" from a list of some 21 possible names for its restaurant that were submitted by an advertising agency to Mr. White, the principal executive officer of defendants. Mr. White testified: "I was submitted a list of names by my advertising firm * * * they submitted me a list of names that sounded good that were typically either Boston or British, or proper names, and I chose that name for that reason * * * I liked the sound of the name. Q. Why did you like the sound of the name? A. It is a beautiful name. *Millions of people use it every week in describing things.* * * * Q. Did it connote to you quality? A. Naturally—*Tiffany always connoted something in the way of quality.*" (Emphasis added.)

The history of the two defendant corporations prior to the above-described selection of the name "Tiffany's" may be appropriately reviewed here in the light of the testimony of Mr. White. The Boston Club was organized in 1951 as a so-called Mass.Gen.Laws, ch. 180 charitable corporation. It occupied premises located at 46 Beacon Street, Boston, from 1951 to 1961. In 1951 it acquired a private club liquor license from the prior owner and occupant of the premises at 46 Beacon Street. During the first seven years of its existence the Boston Club had a membership of approximately 540 members. During the last three years of its existence the membership was increased to about 1500 members. From 1951 until the fall of 1961 meals and beverages were served to members and their guests.

A "health club" was operated on premises known as the "Carriage House" at the rear of 46 Beacon Street, which contained squash and handball courts, and steam, exercise and locker rooms. Rooms on the third, fourth, fifth and sixth floors were rented to unmarried

males. The health club activities were terminated in 1961. The over-all operation of the Boston Club during the nineteen-fifties was not financially successful. In November of 1961 the name "Boston Club" was removed from the canopy outside the main entrance at 46 Beacon Street and was replaced by the name "Tiffany's Restaurant and Lounge." A considerable amount of remodeling and renovating was done at 46 Beacon Street in the fall of 1961 and at about the same time the name "Tiffany's" was adopted. The club liquor license of the Boston Club was transferred at about this time to the Mayfair Club, as was the name "Boston Club," and the Boston Club has ceased to have any substantial connection with this case from and after the transfer of the name and liquor license to the Mayfair Club.

During the period from the opening of the restaurant under the name "Tiffany's Restaurant and Lounge" in November 1961 until the operation was discontinued by the Boston Club and taken over by 46 Beacon Street, Inc., defendant Boston Club caused the placing of many advertisements in Boston newspapers which solicited business from the public generally for its restaurant and cocktail lounge and which made no mention of the fact that it was then being operated under a club license which under Massachusetts law restricted its clientele to members and guests, and which advertising material was written to convey the impression that the restaurant and cocktail lounge were open to the public generally from 11:00 a. m. to 10:00 p. m. daily. (cocktail lounge to 1:00 a. m.)

As part of this advertising campaign defendant conducted a "promotion" in which it advertised that patrons of its restaurant would be given complimentary tickets to a motion picture then playing in Boston entitled "Breakfast at Tiffany's." Some of these ads invited the public to have "Brunch at Tiffany's" at defendant's restaurant. In fact the opening of defendant's restaurant under the name "Tiffany's Restaurant and Lounge" took place while the motion picture "Breakfast at Tiffany's" was playing at the Capri Theatre in Boston. This motion picture was made with the permission of plaintiff, and the script of the picture was examined and approved by counsel for Tiffany & Co. prior to its release. The picture contains colored views of both the interior and the exterior of plaintiff's store on Fifth Avenue, New York, and this when considered with the functional relationship between good silverware, china, and quality dining, makes it abundantly clear that defendant's use of this particular promotional device was a flagrant attempt to "hitch-hike", as it were, on plaintiff's good will and reputation for quality. There was evidence at the trial and I find that customers at the restaurant from time to time made inquiry as to whether or not there was a relationship or connection between the management of plaintiff and the management of defendant's restaurant, and whether or not there was a jewelry store located somewhere on the premises at 46 Beacon Street.

I find that in their advertising defendants played up in a very prominent way the word "Tiffany's", using a script for that word similar to that used by plaintiff in some of its advertising, that they used a diamond-like mark to dot the "i" in the word "Tiffany's," and that defendants' advertising minimized the words "Restaurant and Lounge" in relation to the size of type used for the word "Tiffany's."

I further find that while it is unlikely that any rational person would think he was entering a Tiffany jewelry store when he or she entered the defendant's restaurant, there was and is actual confusion on the part of some members of the public as to whether or not there is any relationship, control, or licensing agreement between the management of plaintiff and the management of defendants.

I find that plaintiff's mark is a strong mark well known to the public, used frequently as a synonym for quality

of a very high degree, and I find that the defendant's arbitrary assumption of the name "Tiffany's" has a clear tendency to subject the good will and reputation of the plaintiff's trade name and trademark to the hazards of the defendant's business. As was pointed out by L. Hand, J. in Yale Electric Corp. v. Robertson, 26 F.2d 972, 974 (2 Cir. 1928), "This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask."

There is in the record of the instant case evidence that plaintiff's mark was subjected to the risks of defendant's business and to a diminishment, dilution or downgrading—particularly in view of the fact that as time has passed defendant's restaurant, the quality of which was not established as outstanding by any evidence presented at the trial, deliberately downgraded its price range in advertisements placed in the Boston newspapers, for the obvious purpose of conveying to the public the impression that relatively inexpensive meals were being served by defendants. It is not without significance in this respect to note that the advertisements placed at the time the defendants assumed the name "Tiffany's" stressed "dining in elegant surroundings of a by-gone era," "an atmosphere of graciousness and charm of Beacon Hill in its glory," "dining on the finest of native New England fare and exquisite Continental dishes." Later ads completely omitted any of the foregoing elements and stressed free parking at the Boston Common Garage, relatively low priced meals, e.g., roast prime ribs of beef, $3.50; baked stuffed lobster, $2.50; and lunches $1.25. The more recent ads also invited attention to the fact that credit was available through Diners Club and American Express credit cards, and the ads were placed in a column called "Where to Dine" which listed approximately fifty restaurants in the Greater Boston area, including such distinguished locations as the Hotel Essex, Chez Freddie Lounge, Chickland at Saugus, and Circle Lounge & Grill. In some of the Boston newspapers defendants' advertisement appeared on the same page as the advertising material for motion pictures graced with such cultural names as "Any Man's Woman," described as "explosive," "too young," and "to immoral;" "Not Tonight, Henry," described as featuring fifteen "no cover" girls; "The Horror Chamber of Dr. Faustus;" "Illicit Love;" "The Stripper;" and last but not least, "Bozo the Clown."

Advertising of this type detracts from the public image of plaintiff produced by the Five Million Dollar investment that plaintiff has made in advertising its name and products in the select publications referred to earlier in this opinion.

The initial requirement for invoking the protection of Mass.Gen.Laws, ch. 110, sec. 7A, is a trade name or mark of distinctive quality. This language has been interpreted as embracing "not merely a distinctive trade name such as a coined word but also * * * characteristic quality inherent in any valid trade name after it has acquired a distinct secondary meaning." Food Fair Stores v. Food Fair, 83 F.Supp. 445, 451 (D.Mass.1948), aff'd 177 F.2d 177 (1 Cir. 1949); Skil Corporation v. Barnet, 337 Mass. 485, 490, 150 N.E.2d 551 (1958). I find that plaintiff has established that the names "Tiffany" and "Tiffany & Co." have acquired a distinct secondary meaning at the very least among those members of the public who purchase jewelry, china, silverware, and the other related items referred to supra.

The second requirement for relief under ch. 110, sec. 7A, is a showing that there is a "reasonable probability that the defendant, even in the absence of actual competition with the plaintiff, by use of the name may detract from the reputation created by the plaintiff in connection with its trade name or marks." Skil Corporation v. Barnet, supra. Mr. White's testimony (p. 10, supra) leaves no doubt that plaintiff's name

is universally used as a symbol of quality by the public and leaves no doubt that defendants were well aware of this high reputation of plaintiff. The risk of detraction may be a risk of an erosion of the public's identification of this very strong mark with the plaintiff alone, thus diminishing its distinctiveness, uniqueness, effectiveness, and prestigious connotations, Stork Restaurant v. Marcus, 36 F.Supp. 90 (E.D.Pa.1941), or the risk may be that of detracting from the plaintiff's good will by the possibility that defendant's use of plaintiff's unique mark will tarnish plaintiff's trade name by reason of public dissatisfaction with defendant's product and a resultant holding of this dissatisfaction against plaintiff. Pure Foods, Inc. v. Minute Maid Corp., supra; Yale Electric Corp. v. Robertson, supra.

An alternative to this second risk is the danger of public identification of plaintiff's trade name or mark with a product or service of a type incompatible with the quality and prestige previously attached by the public to the plaintiff's product. Stork Restaurant v. Sahati, 166 F.2d 348 (9 Cir. 1948). The risk of detraction and the risk of an incompatible product or service becoming identified with the plaintiff's trade name is very much present in the instant case, where defendants have admitted that the name Tiffany has "always connoted something in the way of quality," and where, among its various activities tending toward tarnishment, defendants for a time conducted a radio program over Radio Station WBOS which originated from Tiffany's Restaurant under the name "Conversation Piece from Tiffany's," and was of such a mediocre character that in the words of the principal officer of defendant the program was "really terrible," was "boring," and "stunk." Although this program has now been discontinued, it is graphic evidence of the risks of tarnishment to which a party in the position of plaintiff is exposed if his valuable trade name is put beyond his own control and subjected to the vagaries of a stranger's business.

It is clear from the record as a whole that plaintiff has abundantly satisfied both of the above-mentioned requisites for relief under Section 7A. It should be noted that in addition to qualifying on these two points, the record in the instant case establishes that there is and has been a confusion on the part of the public as to whether plaintiff owned, operated, or sponsored Tiffany's Restaurant and Lounge. This is a further basis for relief under Section 7A. Cf. 265 Tremont Street, Inc. v. Hamilburg, 321 Mass. 353, 357, 73 N.E.2d 828 (1947). This confusion can be laid at the doorstep of defendants who deliberately engaged in a tie-in promotion with the exhibitor of the motion picture "Breakfast at Tiffany's" for the obvious purpose of creating just the type of confusion that has resulted. The fact that plaintiff had published a book on table settings in 1960 and a book on table manners in 1961, prior to defendants' embarking upon this tie-in promotion with the motion picture "Breakfast at Tiffany's", afforded defendants further opportunity for and hopes of success in their campaign to ride the coat-tails of plaintiff's good name.

I rule that plaintiff has clearly established the fact that it has developed its trade name and trademark over the years to the point where it has a strong secondary meaning, and that plaintiff has shown itself entitled to the injunctive protection of Mass.Gen.Laws, ch. 110, sec. 7A, by showing that (1) the unique qualities of plaintiff's trade name and trademark as an advertising device will be impaired by defendant's continued use of the name "Tiffany's" or "Tiffany's Restaurant and Lounge;" (2) that there is a real probability that the continued operation of the defendant under its present name will detract from the reputation of the mark "Tiffany" and "Tiffany & Co.;" and (3) that there is a real probability of public confusion as to the source of the service offered by defendant.

In addition I rule that plaintiff herein has proved it is entitled to

injunctive relief under the Lanham Act, 15 U.S.C. § 1114(1) on the grounds that defendant's continued use of the name "Tiffany" is likely to cause confusion or mistake and to deceive the defendant's customers as to the source of origin of the goods and services dispensed by defendant.

 There remains the question of the injunctive relief properly to be granted herein. In ruling on this I have in mind that plaintiff's trade name ranks with the strongest trade names in the United States. This is not a case where a trader has plucked a word "with favorable connotations for his goods or services out of the general vocabulary and apportionate it to his exclusive use." Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540, 543 (1 Cir. 1957). Rather, this is a situation where a defendant with no discernible secondary purpose of any credibility, (Lambert Pharmacal Co. v. Bolton Chemical Corp., 2 Cir., 219 F. 325; Jay's, Inc. v. Jay's-Originals, Inc., 321 Mass. 737, 75 N.E. 2d 514), has deliberately pirated plaintiff's good name in an attempt to poach upon the commercial magnetism of the sterling trade name developed over the years by plaintiff. Food Fair Stores v. Food Fair, supra, 83 F.Supp. at 451.

In view of what I find to be out and out latter-day piracy, the arbitrary selecting of plaintiff's name from a long list of names solely because defendant sought to cash in on plaintiff's good will, I rule that defendant, its officers, agents, assignees, and employees are hereby permanently enjoined from the use of the name "Tiffany" in any combination or form as part of its corporate name, or as a label, designation, mark, or otherwise, in connection with its business, in any manner whatsoever. Tiffany & Co. v. Tiffany Productions, Inc., 147 Misc. 679, 264 N.Y.S. 459, 461 (Sup.Ct.1932), aff'd. 237 App.Div. 801, 260 N.Y.S. 821, aff'd. 262 N.Y. 482, 188 N.E. 30, 1933.

The injunction contained in the judgment filed herewith is effective at 12:01 A.M., July 5, 1964.